RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0160p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

LOUIS DANA GRADISHER,

*Plaintiff-Appellant,*

*v.*

CITY OF AKRON, et al.,

*Defendants-Appellees.*

No. 14-3973

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 5:12-cv-02362—Sara E. Lioi, District Judge.

Argued: June 10, 2015

Decided and Filed: July 24, 2015

Before: COLE, Chief Judge; GILMAN and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

_____

**ARGUED:** David A. Hamamey II, HAMAMEY LAW FIRM LLC, Middleburg Heights, Ohio, for Appellant. John Christopher Reece, CITY OF AKRON, Akron, Ohio, for Appellees. **ON BRIEF:** David A. Hamamey II, HAMAMEY LAW FIRM LLC, Middleburg Heights, Ohio, for Appellant. John Christopher Reece, Michael J. Defibaugh, CITY OF AKRON, Akron, Ohio, for Appellees.

_____

**OPINION**

_____

COLE, Chief Judge. One afternoon, plaintiff Louis Dana Gradisher consumed multiple alcoholic drinks, then made several erratic phone calls to 911 complaining about someone with a gun. When officers from the City of Akron Police Department arrived at his residence and Gradisher locked his door and retreated upon seeing them, they feared that someone inside might

1

need help. The officers thereupon broke down the door and entered the house. They found Gradisher hiding under a sheet in his dark basement. What happened next is subject to debate, but after a few seconds, one of the officers used a taser on Gradisher because he allegedly resisted arrest.

Gradisher was later found guilty of improperly using the 911 system. He filed an action against several police officers and the City of Akron, asserting causes of action under 42 U.S.C. § 1983 for constitutional violations due to excessive force, warrantless entry, and malicious prosecution, as well as several common-law tort claims. After the parties filed cross-motions for summary judgment, the district court ruled in the defendants' favor on all claims. At issue is whether the district court properly did so. For the reasons below, we affirm in part and reverse in part.

**I.**

On September 2, 2011, Louis Gradisher, a white male, met a friend at a bar, Georgie's, where he had three or four beers and a shot of whiskey. While sitting at the bar, Gradisher noticed the outline of a gun in the pocket of a black man sitting to his left. Gradisher commented about the gun to the man, which triggered a heated exchange. Gradisher then left the bar and went to his residence about a quarter-mile away at 402 Kline Avenue in Akron, Ohio. Once there, he drank another three to five beers.

Gradisher then decided to call 911 from his cell phone to report the man with the gun at Georgie's because Gradisher was upset that the man was "hard and nasty" with him. Gradisher made a total of four calls to 911 that day. On the first call, he refused to give the 911 operator his name and hung up abruptly. The operator called him back. On the return call, Gradisher and the operator got into a heated exchange, causing the operator to hang up, which prompted Gradisher to call 911 two more times, each time using various obscenities. Gradisher later described his conduct on the call as a "[t]otal" and "utter embarrassment." He thought the operator was "smart-mouth[ing]" him, hence the return calls and profanity that he later described as "[i]nexcusable." Gradisher admitted that he did not call to request emergency services and acknowledged that he "hurt [the operator's] feelings." He blamed his calls on the fact that he

had a "buzz on" and was angry over a breakup with his girlfriend. He never thought that the police might be dispatched in response to his calls.

Because of Gradisher's calls, Officers James Craft and Matthew Hackathorn were dispatched to Georgie's. There, they spoke with the bartender, who told them that a black male and a white male were arguing earlier. She told Hackathorn that the white male said that "he had a gun out in his van for [the black male]," and the white male "wanted him to come out to the van." The bartender described the van as a "white work van" and the white male as in his 40s, stocky, and wearing a work shirt.

At some point, 911 dispatchers deduced that the first 911 call regarding a man with a gun at Georgie's was connected to the "multiple unnecessary and vulgar calls to 911" from Gradisher's residence. Officers were thus dispatched to "respond[] to 402 Kline based on multiple 911 calls about a man with a gun."

Officers Jeffrey Smith and James Leadbetter arrived at Gradisher's residence first, and Officers Hackathorn and Craft arrived later after leaving Georgie's. En route, the officers checked for any outstanding warrants linked to the address and found a failure-to-appear warrant concerning Gradisher. The physical description of the wanted individual on the warrant matched the generic description of the white male given by the bartender. In addition, the officers saw a white work truck in the driveway, and when they ran a check on the license plate, the results matched the bartender's description of the white male. At the time, the officers were confused about who had the gun since the 911 caller said that it was a black male, but the bartender said that it was a white male.

While the officers were sent to check on the apparent misuse of the 911 system, given the confusion, the officers wanted "to see if there was a problem or [if] someone needed help at 402 Kline Avenue." Hackathorn testified,

> When someone calls [911] numerous times and they don't give a reason other than they want to be confrontational on the phone and they're . . . very rude and erratic on the phone[,] [c]ould there be something going on where he might need help and he may not realize it? He may be going through an episode, could be a reaction to something. . . . [M]y 13 years of experience on my job is when someone calls [911] numerous times usually there's a reason, they usually need

some type of help or they're going through some type of crisis. So through my training and experience we have to make sure someone is okay . . . .

Smith testified that "with [the 911 caller's] erratic and irrational behavior, and the possibility of a gun, we had a duty to check his welfare."

Hackathorn approached the residence, knocked on the front door, and announced, "Akron Police, please come to the door." He heard someone inside lock the dead bolt. Leadbetter, who went around to the house's rear, saw a man exit the back door. Leadbetter yelled, "Hey, police," but the man retreated and slammed the door. Leadbetter called after the man and said that they just wanted to speak with him, but did not know at the time that the man was Gradisher.

As this transpired, Sergeant Vince Yurick, a police supervisor, was listening to radio traffic from the dispatches to Georgie's and 402 Kline Avenue. Yurick's "understanding was that there was a guy with a gun at Georgie's, and somehow this fellow left and was calling now from a different address of 402 Kline, and there were numerous calls of 911 being received from there. . . . And then the officers . . . find out that . . . there's a person from that address calling 911, it's associated with the gun at Georgie's, a person comes out the back door and goes back in." Under "all those circumstances," Yurick concluded that the situation was "very serious and dangerous" and "could be bad." As he later explained,

> [I]n my 17 years of working patrol, [if] we're getting 911 calls from a house and someone won't communicate with us, but we know someone's in there, that's a problem for me. I need to make sure that we find out why. Is someone being held in there at gunpoint? Has someone been murdered? I mean, that's just a fact of my job.

In addition, because Yurick knew that someone in the residence had an outstanding warrant, and the 911 calls involved a person who allegedly had a gun, his experience led him to conclude that there was "an increase in the level of seriousness or dangerousness on this call" and that the officers "ha[d] a duty to make sure someone's not being held at gunpoint or had been murdered there."

Hackathorn contacted Yurick, discussed the situation with him, and the two decided that the officers should conduct a "welfare check" on the residence given Gradisher's "erratic behavior" and many 911 calls. At the front door, Hackathorn announced that the officers "were

going to force the door open to check for anyone injured." After receiving no response, he tried to see if he could reach in some window panels to unlock the door "without busting the door off the frame," but the windows were too high, so Smith kicked the door down. Gradisher never responded as the door was forcibly opened.

After he decided that he was "not going to call [911] again," Gradisher had gone to shower in his basement bathroom when he heard his dog "going crazy jumping on the door." He assumed that somebody was there, but "just continued on with [his] shower." Gradisher then "heard a thunderous bang, bang, bang on [his] front door" and thought that somebody was breaking into his house. He testified that "the furthest thing from [his] mind" was that the police were at his door because he "felt that [he] had done nothing wrong other than give the 911 dispatcher a hard time."

Gradisher quickly got dressed and, hearing people upstairs, "went to the nearest corner of [his] basement and hid behind shelves . . . and threw a sheet over [his] head." Gradisher claims that he feared that a motorcycle gang was breaking into his house because, approximately one year earlier, Gradisher had been "[s]everely beaten" by such a gang after he confronted them about their throwing a beer box onto his yard. While sitting in a crouched position, he saw light from a flashlight through the sheet and heard one of the officers say, "I think he's here." Though Gradisher later testified that the officers did not announce themselves as police when they entered the basement and found him, he also said that he "had a pretty good idea that they were the police then."

At this point, the parties' accounts about what happened next diverge. Gradisher described what occurred as follows:

> And then he finds me with the sheet, under the sheet, I'm sitting here like this, and then when he -- I saw the flashing lights over the sheet, the sheet illuminate up, and that's when I thought, okay, these are the police. So within a split second of that he grabbed the sheet and pulled it off of me and I went just like this (indicating), I put my hands up and my legs out, I said, You got me, You got me. And at that time he fired the shot into my breast and started delivering the electricity. At that same time he started delivering the electricity, they both were screaming, Get the fuck down, Get the fuck down. And I remember grunting because it contorted me like this (indicating). When he shot me it contorted me up tight. And then I said, I can't move, I'm being electrocuted, I can't move.

> And they just kept giving me -- the current was nonstop, just kept giving it to me. And then I was in the sitting position, I was like -- ([] groaning) and slumped over to my right, and then the only thing I remember after that is them taking me up out of the basement.

In other words, Gradisher asserts that he raised his hands immediately and never resisted when the officers found him, but without any warning or opportunity to give himself up for handcuffing, he was tased. About the officers' reports that he would not comply with their commands to present his hands to be handcuffed, Gradisher stated, "That's a lie."

It is undisputed that Officer Craft actually used the taser on Gradisher. According to Craft, when he first saw Gradisher in the basement, Gradisher was "in a crouched or attempting-to-be-crouched position." Gradisher "was in an active position" and "not stationary with both knees on the ground," though Craft then testified that he does not recall "which knee or if his knees were touching the ground or not." Craft thought that Gradisher was attempting to get up from the ground. By his account, the officers instructed Gradisher to get on the ground and raise his hands, but he did not comply. Because Gradisher's left arm was reaching towards his waistband, Hackathorn grabbed that arm, but Gradisher pulled it away. Meanwhile, Craft tried to grab Gradisher's right arm to be handcuffed, but was unsuccessful. Craft testified that he then ordered Gradisher to surrender his arm or Craft would use his taser. Gradisher allegedly did not comply and continued to reach towards his waistband.

Craft claims that he then decided to deploy his taser because Gradisher "was actively up and down trying to push away out of the situation, out of the corner he was in," and "he went back down with his hands, his arm, which went where [I] could not see it at his waistline." Craft shot Gradisher in the chest with the taser probes and pulled the taser's trigger. When Gradisher did not react, Craft pulled the trigger a second time, causing Gradisher to wince during a partial cycle. Craft pulled the trigger again for one full cycle. Although the officers screamed commands at Gradisher to give up his arms and stop resisting during the tasing, and he was able to hear them, he claims that he could not comply because he was being electrocuted. Craft did not think that the taser affected Gradisher much (possibly due to a poor connection) because Gradisher allegedly continued to resist, so Craft "decided to move in on him." He "drive-stunned," i.e., pushed the taser directly against, Gradisher in his arm or side and then

administered one final drive-stun for a full cycle while punching Gradisher's right side with his arm three to four times. Gradisher claims that he could not move, slumped over to his right side, and may have blacked out. Hackathorn and Smith then handcuffed Gradisher and led him upstairs. Hackathorn estimates that approximately five seconds elapsed from when he first issued Gradisher a command to when Craft began to tase Gradisher.

During the entire incident, Leadbetter never directly engaged Gradisher, but provided cover to the other officers with his gun drawn. The Akron Fire Department EMS eventually responded to the scene and removed the taser barbs from Gradisher. Its report did not reflect that Gradisher had any other complaints, respiratory distress, or major signs of trauma.

Craft testified that he decided to use his taser because Gradisher was not obeying the officers' commands and because he believed Gradisher might have had a gun. As he explained,

> [W]e were called out reference [sic] a male with a gun in a bar. We spoke to several people in the bar who said [Gradisher], not speaking of him by name, but described him and his vehicle, said he had a -- he was in here yelling and ranting and raving about a gun and said he had a gun in his van that he was gonna go get and then we received calls from him from his house, that van was there. So my train of thought here is safety for me and my officers that are with me. I'm not assuming he has a gun but I don't know if he does or not.
>
> \*\*\*
>
> [H]e was actively coming up and trying to push out of a pile of rubbish and whether -- you know, naturally that's going to include you losing your balance and going to the ground where I can't see your hands. Now, I don't know if he's gonna pull up with a gun or if he's going to pull it out of his waist or he's gonna pull it out of the clothes that he was hiding in.

Sergeant Michael Joyner conducted a review investigation of the use of force on Gradisher, which included speaking with both the officers and Gradisher at the scene, as well as reviewing information about the taser's usage. Joyner concluded that the use of force was justified.

Officer Hackathorn signed criminal complaints against Gradisher in the Municipal Court of Akron, charging him with resisting arrest in violation of Ohio Revised Code § 2921.33 and improper use of the 911 system in violation of Ohio Revised Code § 4931.49(E). Gradisher

pleaded no contest to, and was found guilty of, improper use of the 911 system; the resisting-arrest charge was dismissed.

Gradisher thereafter filed suit against Officers Hackathorn, Smith, Craft, and Leadbetter, Sergeant Vince Yurick, and Chief James Nice, all of the City of Akron Police Department, individually and in their official capacities, bringing causes of action under 42 U.S.C. § 1983 for constitutional violations due to excessive force, warrantless entry, wrongful arrest and imprisonment, and malicious prosecution in violation of the Fourth and Fourteenth Amendments of the United States Constitution.  He also brought various state-law causes of action against them, as well as a cause of action for municipal liability against the City of Akron.  The parties filed cross-motions for summary judgment, and the district court ruled in favor of the defendants on all grounds and entered judgment accordingly.  Gradisher appeals the district court's grant of summary judgment for the defendants on the causes of action alleging excessive force, warrantless entry, malicious prosecution, state-law torts, and municipal liability.

## II.

### A.

We review de novo a district court's summary judgment order.  *Murray-Ruhl v. Passinault*, 246 F. App'x 338, 342 (6th Cir. 2007); *Black v. Roadway Express, Inc.*, 297 F.3d 445, 448 (6th Cir. 2002).  Under Federal Rule of Civil Procedure 56, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact exists when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for that party."  *Murray-Ruhl*, 246 F. App'x at 342.

"Qualified immunity is an affirmative defense that generally shields government officials from suit under § 1983 for their discretionary actions."  *Cummings v. City of Akron*, 418 F.3d 676, 685 (6th Cir. 2005).  To overcome that defense, a plaintiff must show that, when the facts are viewed in the light most favorable to him, (1) the defendant deprived him of a

constitutionally protected right, and (2) the right was "clearly established" at the time of the violation. *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 400 (6th Cir. 2009). "Courts may [] address these prongs in either order; indeed one may be dispositive." *Austin v. Redford Twp. Police Dep't*, 690 F.3d 490, 496 (6th Cir. 2012). "If either one is not satisfied, qualified immunity will shield the officer from civil damages." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013).

With regard to the second prong, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (internal quotation marks and brackets omitted). Whether a right has been clearly established should not be determined at "a high level of generality." *Id.* at 2084. Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 2083. Thus, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "The essence of qualified immunity [] is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012). "[S]ince the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury," *Brandenburg v. Cureton*, 882 F.2d 211, 216 (6th Cir. 1989), "summary judgment is inappropriate where there are contentious factual disputes," *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 903 (6th Cir. 1998).

## B.

The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV. "Searches of the home must be reasonable." *Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010). "This reasonableness requirement generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003). Warrantless searches are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004).

Certain exceptions to the warrant requirement exist, however, including the presence of exigent circumstances. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *Johnson*, 617 F.3d at 868. Under this exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Whether such a need exists requires an objective assessment of the circumstances. *Id.* at 404. "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception," but they must have an objectively reasonable basis for believing that "a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47, 49 (2009) (internal quotation marks and brackets omitted). "But by the same token, their decision to enter must be based on more than a hunch or 'the mere possibility' that someone inside needs immediate aid." *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013).

Here, the officers and Sergeant Yurick justify the entry based on the following facts: Gradisher made several drunken and abusive phone calls to 911 and reported that someone had a gun at a bar; when officers went to the bar to investigate, the bartender informed them that a white male, whose indistinct description matched Gradisher, had earlier made a subtle threat to another patron about having a gun; after the officers went to Gradisher's residence, they learned that he had an outstanding warrant for failure to appear; and when the officers tried to speak to Gradisher, he bolted his front door and retreated into his back door when he was spotted coming out from there.

Whether there was an objectively reasonable basis for the officers to enter Gradisher's residence without a warrant due to exigent circumstances is a close question. But we need not decide whether the officers unlawfully entered the residence because "[w]e opt to answer the easier [] question[]" of whether the officers violated some constitutional right belonging to Gradisher that was clearly established at the time of the incident. *Hagans*, 695 F.3d at 508.

Gradisher argues that his "right to be free from a warrantless forced entry absent exigent circumstances was clearly established on September 2, 2011, and, therefore, these defendants are

not entitled to qualified immunity." But Gradisher frames the issue at too high a level of generality. *See al-Kidd*, 131 S. Ct. at 2084. The appropriate question to ask is whether, on September 2, 2011, it was clearly established that no exigent circumstance exists when officers enter a residence in response to multiple erratic 911 calls from there and when they believe that someone inside may have threatened the use of a gun.

We have held that "evidence of firearms within a residence does not create an exigency by itself," *Walters v. Stafford*, 317 F. App'x 479, 489 n.9 (6th Cir. 2009), though additional factors coupled with such evidence may be sufficient to justify a warrantless entry or search, *see United States v. Bates*, 84 F.3d 790, 795 (6th Cir. 1996). Such factors include "threats to an officer's safety, a criminal record reflecting violent tendencies, or a verified reputation of a suspect's violent nature." *Id.* Another example is a 911 hangup call that was made from the residence since such a call might indicate that someone inside may need an officer's aid. *Causey v. City of Bay City*, 442 F.3d 524, 530 (6th Cir. 2006). Along those lines, we have also held that when officers responding to a 911 call "announc[e] their presence [at a residence] and, after receiving no answer, enter[] in order to perform a cursory search for any endangered or injured persons," they have an objectively reasonable basis to do so even without a warrant. *Johnson*, 617 F.3d at 870.

Viewing the facts in the light most favorable to Gradisher, we are unpersuaded that the defendants violated any of his clearly established rights by entering his house. As our precedent establishes, such an entry may be justified if there is evidence that an individual in a residence has a gun and officials receive a 911 call from within that residence that was hung up. Here, the officers and Sergeant Yurick stand on weaker ground because they had attenuated reasons for thinking that someone in Gradisher's residence could be armed based largely on Gradisher's report that a black male at Georgie's had a gun and the bartender's vague description of a white male who allegedly said he had a gun in his van. Furthermore, multiple 911 phone calls from someone who appears to be merely harassing the dispatcher is less suggestive of an emergency than silence on the other end. But we can find no law confirming that the officers and Sergeant Yurick were clearly wrong for deciding to enter on those bases, and Gradisher points us to none. As we have said, "[e]ven if the officers' belief that someone within [a residence] could be in

danger is a close question, the officers are entitled to the benefit of the doubt under the qualified immunity standard." *Dickerson v. McClellan*, 101 F.3d 1151, 1160 (6th Cir. 1996). That principle certainly applies here. Accordingly, we affirm the district court's grant of summary judgment to the officers and Sergeant Yurick on Gradisher's unlawful-entry cause of action because the defendants did not violate Gradisher's clearly established constitutional rights as of September 2, 2011, by entering his residence.

## C.

"This court has held that the right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). A claim of excessive force turns on whether the officer's actions were "objectively reasonable" in light of the totality of the circumstances. *Id.* The trial court must perform a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). Among other factors, this balancing "requires careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*; *Lustig v. Mondeau*, 211 F. App'x 364, 369–70 (6th Cir. 2006).

Gradisher's appeal concerning the officers' use of excessive force focuses exclusively on Craft's use of the taser on Gradisher. Because each officer's liability must be individually assessed in a Section 1983 action, *see Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 541–42 (6th Cir. 2008), we affirm with little difficulty the district court's grant of summary judgment to Officers Hackathorn, Smith, and Leadbetter on this cause of action.

Turning to Craft's use of the taser on Gradisher, we have held that "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." *Hagans*, 695 F.3d at 509. "By contrast, when we have found excessive force, the suspects were compliant or had stopped resisting." *Id.* In determining whether officers used excessive force, courts have placed great weight on officers' failure to

warn a suspect before deploying a taser.  *Cockrell v. City of Cincinnati*, 468 F. App'x 491, 498 (6th Cir. 2012) (Cole, J., concurring).

The parties dispute whether or not Gradisher was resisting or refusing to be handcuffed. The officers claim that Gradisher repeatedly pulled his arms back when they attempted to handcuff him.  They assert that Gradisher kept reaching his hands towards his waistband, possibly for a weapon, and would not comply with their commands to give up his arms both before and during the tasing.  Gradisher, conversely, says that when the officers pulled the sheet off of him, he held his hands up and his legs out, and said "You got me, You got me," yet they deployed the taser "[a]t that time."  He also claims that the officers gave no warning before immediately tasing him, and they continued to tase him even though he could not follow orders since he was incapacitated by the tasing.  Thus, whether Gradisher resisted or not and whether he was given an opportunity to comply with commands before, and while, being tased are material facts in dispute.  "Where, as here, the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability."  *Sova*, 142 F.3d at 903.  Accordingly, we reverse the district court's grant of summary judgment to Officer Craft on Gradisher's excessive-force cause of action.

**D.**

To support a claim of malicious prosecution,

a plaintiff must prove the following:  (1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor.

*Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014).

The district court granted Hackathorn summary judgment on Gradisher's malicious-prosecution cause of action.[1]  On appeal, Gradisher makes a cursory argument that he did not

---

[1]Although Gradisher's Second Amended Complaint asserted a malicious-prosecution claim against all of the officers, his brief on appeal only argues that "Hackathorn was not entitled to summary judgment."  He has therefore waived his appeal of this cause of action with regard to the other officers.  *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) (per curiam).

resist arrest and thus there was no probable cause in charging him with doing so. But "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (citation and internal quotation marks omitted). We therefore affirm the district court's grant of summary judgment to Hackathorn on this cause of action.

**E.**

"To prevail in a § 1983 suit against a municipality, a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). We have explained:

> A plaintiff can make a showing of an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

The district court granted summary judgment to the City of Akron on Gradisher's claim of municipal liability given the district court's conclusion that the individual officers did not commit any predicate constitutional violation.[2] *See Ewolski v. City of Brunswick*, 287 F.3d 492, 516 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."). Thus, the district court did not address whether any municipal policy or custom allowed for the harms Gradisher allegedly suffered. But because we reverse the district court's grant of summary judgment to Craft on the excessive-force claim, we also reverse the district court's grant of summary judgment to the City of Akron on the companion municipal-liability claim and remand for the district court to determine in the first instance whether summary judgment should be granted to either party; we affirm the district court's ruling on municipal liability in all other respects.

---

[2]The district court also held that Chief Nice could not be held personally liable for any actions of the other officers. Because Gradisher does not claim that Nice directly participated in or encouraged the alleged wrongdoing, we affirm the district court's grant of summary judgment in his favor. *See Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

**F.**

Ohio Revised Code § 2744.03(A)(6) provides that employees of a political subdivision are immune from liability for torts under Ohio law unless "[t]he employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities," or "[t]he employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6). "An actor can be found to be reckless either based on his actual knowledge of a risk of harm or under an objective standard (that the risk is 'obvious')." *Goodwin v. City of Painesville*, 781 F.3d 314, 334–35 (6th Cir. 2015). "Satisfying the objective reasonableness standard shields [] officers under state statutory immunity as well." *Jones v. City of Cincinnati*, 507 F. App'x 463, 470 (6th Cir. 2012); *see also Burdine v. Sandusky Cnty., Ohio*, 524 F. App'x 164, 171 (6th Cir. 2013); *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009).

The district court concluded with little explanation that the defendants are immune from tort liability for their actions because they were performing governmental functions and because Gradisher failed to show that any statutory exception applied. Gradisher, on the other hand, argues that the officers are not immune from his causes of action for assault and battery, intentional infliction of emotional distress, and gross neglect because their warrantless entry and excessive use of force were reckless.

Because there is a genuine dispute of material fact about whether Craft used excessive force or was objectively reasonable in tasing Gradisher, we reverse the district court's grant of summary judgment in Craft's favor on the state law claims for assault and battery, intentional infliction of emotional distress, and gross neglect to the extent that they are related to tasing and remand for the district court to determine whether summary judgment should be granted to either party. *See Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 667 (6th Cir. 2013) (remanding Ohio state-law claims "[g]iven the presence of several remaining factual disputes"); *Martin v. City of Broadview Heights*, 712 F.3d 951, 963 (6th Cir. 2013) ("Qualified immunity does not protect the officers here. As resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the [] state-law claims."). However,

because the officers did not violate any of Gradisher's clearly established rights when they entered his residence, and nothing else shows that they otherwise acted "with malicious purpose, in bad faith, or in a wanton or reckless character," state immunity applies to the remaining claims and we affirm the district court's judgment in all other respects. *Hagans*, 695 F.3d at 511.

### III.

Because there are genuine disputes of material facts related to whether Officer Craft used excessive force in tasing Gradisher, we reverse the district court's grant of summary judgment to Craft on the excessive-force cause of action and to the City of Akron on the corresponding municipal-liability cause of action. For the same reason, we reverse the district court's grant of summary judgment to Craft on the state-law causes of action for assault and battery, intentional infliction of emotional distress, and gross neglect to the extent that they relate to the tasing.

We affirm the district court's judgment in all other respects and remand for proceedings consistent with this opinion.