NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 18a0130n.06

No. 17-3743

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Mar 14, 2018
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| GUILFORD THORNTON, et al., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF COLUMBUS, et al., | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: KEITH, KETHLEDGE, and THAPAR, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.** Appellant Guilford Thornton brought this 42 U.S.C. § 1983 action after being shot by Columbus Police Department Officers. The district court granted summary judgment in favor of the Appellees – the City of Columbus, Ohio and the police officers involved in the shooting. Appellant now appeals that decision, maintaining that the police officers and the City of Columbus violated his constitutional rights. We disagree, and affirm the district court's decision.

## I.     BACKGROUND

### 1. Dispatches

Appellant Guilford Thornton ("Thornton") lives with his wife, Bonnie Thornton ("Bonnie"), at 1542 Oakwood Avenue in Columbus, Ohio. Thornton placed a non-emergency call to the Columbus Police Department ("CPD") on April 21, 2013 at around 7:51 p.m., explaining that two young black males, whom he believed had been involved in an assault

several days earlier, had just walked down the street in front of his house. CPD Officer Piotr Deredzinski, who was working patrol in the area, was dispatched to the Thornton residence at approximately 7:58 p.m.

Around 7:58 p.m., CPD's 911 center received a separate, emergency call to the Thornton address. In this instance, Thomas A. Davis, Jr. ("Davis") called to report that a man at that address had pointed a gun at Davis's son and his friends earlier. Davis informed dispatch that when he approached the man's porch to confront the man about displaying a gun to the kids, the man "pulled a gun" on him as well. Davis described the man as a white male wearing a black shirt and blue jeans, who was standing on the porch with a gun.

CPD dispatch aired this additional information about the events reported by Davis. Since the incident now involved at least one firearm, additional CPD Officers Danny Dupler and Jeffrey Kasza (together, the "Officers") volunteered for the run because they were on patrol nearby. The Officers arrived at the Thornton's address around 8:00 p.m.

**2. Home Entry and Shooting**

As the Officers drove north on Oakwood Avenue and approached the residence, they observed a group of people a few doors south of the dispatched address. While the Officers maintain that they saw a white male with a "long gun" standing on the house's front porch who quickly ran inside when he saw the police cruiser approaching, Thornton stresses that he did not possess a gun while standing on the porch. In any event, when the Officers exited their police cruiser, at least one person in the group of individuals yelled that a man had a gun and that he had just run inside the residence. At this point in time, the Officers did not know who the man on the porch was, nor did they know whose house he had just entered.

The Officers approached the front porch with their service weapons drawn and positioned themselves on the porch between Thornton and the individuals outside. The entrance to the residence had two doors: a glass exterior door that was closed, and a wooden interior door that was opened. Through the glass door, the Officers could see into the entryway area and living room of the home, but could not see anyone inside. Officer Kasza saw a long gun lying on a chair in the living room area, which was later determined to be an assault rifle. It is disputed whether the Officers actually entered the house and when this may have occurred. Nonetheless, the Officers announced themselves as police officers and ordered Thornton to come out and drop his weapon.

Meanwhile, unbeknownst to the Officers, Thornton went to retrieve a 12-gauge shotgun from the master bedroom of his house. Thornton noted that he was simply "arming up in case whatever," and had no intention of going outside with the shotgun. Bonnie Thornton, however, believed that Thornton's intention was to take the shotgun outside, and later relayed this belief to CPD investigators. The Officers observed Thornton walking from the bedroom into the living room, and claim that Thornton was holding the shotgun chest high, angled across his body.

The Officers maintain that Thornton was walking diagonally toward them, with one hand "under the shotgun's barrel, at its pump," and the other hand "holding the shotgun at its trigger area," so that "[t]he barrel of the shotgun was angled upward and slightly to [the officer's] right." The Officers also contend that although the shotgun was not directly pointed at either officer, Thornton was holding the gun as though he could lower it toward them and fire at any moment. Thornton was less than fifteen feet away from the Officers when he entered the living room; the Officers were standing side by side. The Officers "immediately," "loudly," and "repeatedly," ordered Thornton to drop the weapon. The Officers contend that Thornton was looking right at

them, ignored their commands, did not drop the shotgun, and instead continued to walk towards the Officers.

The Officers then fired their service weapons at Thornton. Thornton was shot three times: once in his right hand, once in his left hand, and once in his upper left thigh. After being shot, Thornton stumbled toward a chair that had an assault rifle sitting on it.

Thornton, however, disputes this version of the events. Thornton stresses that he walked into his living room and was shot before even realizing that the Officers were present. Thornton further argues that he never turned toward the front door and maintains that he was walking toward a chair on the far side of the room. This version of the events, according to Thornton, is consistent with an "entrance wound to the lateral left thigh [and] an exit wound in his medial inner gluteal area." Thornton does not dispute, however, that he was holding the shotgun when he was shot, nor does he dispute that there was an assault rifle on the chair in his living room at the time of the shooting.

As soon as Thornton put the weapon down, the Officers ordered him to the ground; Thornton complied with the Officers' orders. Officer Dupler secured the residence while Officer Kasza held cover over Thornton. One of the Officers then informed CPD Dispatch that shots were fired and that a medic was needed for Thornton. This dispatch occurred at 8:04 p.m., which is approximately four minutes after the Officers initially informed CPD Dispatch that they would head to the Thornton residence, at 8:00 p.m. Accordingly, the time between the two dispatch communications was no more than four minutes. The Officers maintain that it took only seconds for them to stop the cruiser, get out, and run up to the porch.

### 3. Events After The Shooting

Bonnie Thornton, who came out from the back of the house while Officer Dupler was securing the residence, acknowledged hearing the Officers tell Thornton to drop his weapon. Other CPD officers arrived at the scene within ten minutes, and Officers Kasza and Dupler were removed from the scene by members of CPD's Officer Support Team. The Officers were taken to the CPD's 13 Precinct substation, were separated from each other, did not speak to each other, and did not speak to anyone about the incident.

The Officers returned to the scene several hours later for a walkthrough and for processing. By that time, the Fraternal Order of Police – the collective bargaining unit of the CPD – had provided the Officers with an attorney. Each officer participated in the walkthrough individually with his attorney, but not with each other. During the walkthrough, the Officers gave investigators a general sense of the events that took place and indicated where the investigators should be focusing their search for evidence. The walkthroughs are not recorded and are considered informal.

After the Officers completed their respective walkthroughs, each officer was processed separately in the presence of his attorney. Processing occurred in a mobile command bus near the scene, and the Officers were photographed and surrendered their firearms and ammunition – which were photographed as well. CPD Sergeant John Schlabach conducted a "round count" and concluded that Officer Dupler had fired two rounds, while Officer Kasza had fired one. Both officers declined to give a formal statement on the night of the incident.

The Officers were then sent home and placed on three days' administrative leave, during which they attended a counseling session with a licensed psychologist before returning to work. Furthermore, each officer separately prepared a written statement about the incident with the

assistance of counsel. Approximately ten days after the incident, the Officers participated in formal interviews with CPD investigators and signed their written statements as part of these interviews. The Officers had no further involvement with this matter until April 2014, when they testified at Thornton's underlying criminal trial for aggravated menacing charges.

### 4. Procedural Posture

Thornton and his wife filed a civil complaint on April 2015, asserting state and federal law claims against the City of Columbus, the CPD, CPD Chief Kim Jacobs, CPD Officer Danny Dupler, CPD Officer Kasza, and CPD Detective Patricia Clark. Both CPD and Chief Jacobs filed motions to dismiss, which Thornton and his wife did not oppose. Subsequently, by agreement of the parties, the trial court dismissed CPD and Chief Jacobs from the case.

The City of Columbus filed a motion to dismiss on June 11, 2015. The district court granted the City's motion, dismissing the state law claims with prejudice and dismissing the federal law claims without prejudice. An amended complaint was filed on March 31, 2016.

Each remaining Defendant – Officers Dupler and Kasza, Detective Clark, and the City - filed a Motion for Summary Judgment. On June 14, 2017, the district court filed an Opinion and Order granting each Motion for Summary Judgment and dismissing the Complaint. Appellant and Bonnie Thornton timely appealed on July 13, 2017, but subsequently withdrew the portion of the appeal involving Appellant's claims against Detective Clark, Appellant's state law claims, and Bonnie Thornton's claims. Accordingly, this appeal only concerns the district court's decision with respect to Appellant's federal claims against Officer Dupler, Officer Kasza, and the City.

## II. DISCUSSION

### A. Standard of Review and Applicable Law

#### 1. Fed. R. Civ. P. 56(a) – Summary Judgment

We review a district court's grant of summary judgment de novo. *Watson v. Cartee*, 817 F.3d 299, 302 (6th Cir. 2016). Summary judgment is appropriate only where there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. *Richmond v. Huq*, 879 F.3d 178, 186 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Richmond*, 879 F.3d at 186 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In determining 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law,' this Court must view all of the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Id.* (quoting *Anderson*, 477 U.S. at 251-52).

#### 2. 42 U.S.C. § 1983 and Qualified Immunity

Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Burley v. Gagacki*, 729 F.3d 610, 619 (6th Cir. 2013) (quoting *Sigley v. City of Parma Heights*, 437 F.3d

527, 533 (6th Cir. 2006)). Here, there is no dispute that the officers were acting under color of state law. Accordingly, our only inquiry is whether the Officers deprived Thornton of a constitutionally-protected right.

In the instant matter, the Officers raise the defense of qualified immunity. "Qualified immunity shields government officials from civil liability in the performance of their duties so long 'as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This type of immunity "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015) (quoting *Malley v. Briggs*, 475 U.S. 335, 343 (1986)). Qualified immunity will ordinarily apply "unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful." *Getz*, 833 F.3d at 652 (citing *Ewolski v. City of Brunswick*, 287 F.3d 492, 501 (6th Cir. 2002)). "The essence of qualified immunity is to give government officials cover when they resolve close calls in reasonable (even if ultimately incorrect) ways." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 511 (6th Cir. 2012).

The qualified immunity analysis requires a two-step inquiry: "(1) whether a constitutional right has been violated; and (2) whether that right was clearly established." *Getz*, 833 F.3d at 652 (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009)). "The steps need not be taken in that order." *Getz*, 833 F.3d at 652 (citation omitted). If either step is not satisfied, "qualified immunity will shield the officer from civil damages." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013)

With respect to the second step of the qualified immunity analysis, "[a] Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (internal quotation marks and brackets omitted). "Whether a right has been clearly established should not be determined at 'a high level of generality.'" *Gradisher v. City of Akron*, 794 F.3d 574, 583 (6th Cir. 2015) (quoting *Ashcroft*, 563 U.S. at 742). This step requires the court to determine whether "existing precedent placed the conclusion" that the defendant violated the constitution under the circumstances "beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (quoting *Ashcroft*, 563 U.S. at 741). Consequently, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

## B.    Analysis

### 1.  The Officers' Warrantless Entry Was Not A Violation Of A Constitutional Right

Construing the facts and drawing all inferences in favor of Thornton, we find that the Officers' warrantless entry into Thornton's home on April 21, 2013 was not unreasonable. The Fourth Amendment to the United States Constitution protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV. "Searches of the home must be reasonable." *Johnson v. City of Memphis*, 617 F.3d 864, 867 (6th Cir. 2010). "This reasonableness requirement generally requires that police obtain a warrant based upon a judicial determination of probable cause prior to entering a home." *Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) (citation omitted). "Warrantless searches are presumptively unreasonable." *Gradisher*, 794 F.3d at 583 (citing *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)).

9

However, "certain exceptions to the warrant requirement exist . . . including the presence of exigent circumstances." *Gradisher*, 794 F.3d at 583 (citing *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *City of Memphis*, 617 F.3d at 868. Under this exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

Determining "[w]hether such a need exists requires an objective assessment of the circumstances." *Gradisher*, 794 F.3d at 583-84 (citing *Brigham City*, 547 U.S. at 404). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception," but there must be an objectively reasonable basis for believing that "a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47, 49 (2009) (internal quotation marks and brackets omitted). "But by the same token, their decision to enter must be based on more than a hunch or 'the mere possibility' that someone inside needs immediate aid." *Nelms v. Wellington Way Apartments, LLC*, 513 F. App'x 541, 545 (6th Cir. 2013) (quoting *United States v. Radka*, 904 F.2d 357, 362 (6th Cir. 1990)). Lastly, although the determination of exigent circumstances is normally a question reserved for the jury, "in a case where the underlying facts are essentially undisputed, and where a finder of fact could reach but one conclusion as to the existence of exigent circumstances, the issue may be decided by the trial court as a matter of law." *Ewolski*, 287 F.3d at 501 (citing *Hancock v. Dodson*, 958 F.2d 1367, 1375 (6th Cir. 1992)).

Here, it is disputed whether the Officers actually saw Thornton on his porch with a gun when they first arrived on the scene. There is also a factual dispute with respect to whether the

Officers entered the residence. Nevertheless, viewing the facts in the light most favorable to Thornton and assuming that the Officers entered the residence, we find that exigent circumstances existed such that the Officers' entrance into the residence was reasonable.

The Officers responded to a call involving an unknown man threatening others with a firearm. When the Officers arrived on the scene, at least one person informed the Officers that the man who had been threatening people with a firearm had run inside the residence at issue while maintaining possession of his firearm. The Officers did not know who lived at the residence, nor did they know if anyone was inside. Under Supreme Court precedent, exigent circumstances existed under these facts irrespective of whether the Officers actually saw Thornton enter the residence with a firearm. In *Warden v. Hayden*, 387 U.S. 294, 298 (1967), the Court found that exigent circumstances existed where officers learned from a dispatcher that an armed robber ran into a residence. Given the factual similarities between the instant matter and *Warden*, the Officers did not need to witness Thornton enter the residence with a firearm for exigent circumstances to reasonably exist.

To the extent Thornton argues that "pulling a gun" is not the same as threatening someone with a gun, the district court properly noted that this contention is a "futile exercise in semantics." Indeed, a dangerous precedent would be set by finding that casual language such as "pulling a gun" could not be interpreted by an officer as threatening someone with a firearm. Moreover, the fact that Thornton had merely threatened someone with a firearm as opposed to actually firing it at anyone does not preclude a finding of exigent circumstances. *See United States v. Johnson*, 106 F. App'x 363, 368 (6th Cir. 2004) ("Police are not required to wait for injury or death to occur in their presence before acting to protect people from a gunman who has amply demonstrated propensity to use his weapon."). Assuming that the Officers actually

11

entered the residence, the Officers' warrantless entry into Thornton's residence occurred in the presence of exigent circumstances; therefore, we find there was no violation of a constitutionally protected right. Consequently, the Officers are entitled to qualified immunity on this issue and the district court properly granted summary judgment on Thornton's § 1983 claims against the Officers. We need not discuss the "clearly established" prong of qualified immunity analysis because Thornton has failed to establish the violation of a constitutional right. *See Martin*, 712 F.3d at 957.

## 2. The Officers' Use of Force Was Not A Constitutional Violation

"This court has held that the right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001). This court employs an objective-reasonableness test to determine whether an officer has used excessive force in violation of the Fourth Amendment, asking "whether the officer's actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989) (internal quotation marks omitted). A trial court must perform a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks omitted). This balancing analysis requires, *inter alia*, "careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by fight." *Id.*; *see also Gradisher*, 794 F.3d at 585.

In evaluating these factors, this court must keep in mind that "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene,

rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This approach allows for the fact "that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "In making this judgment, we must be careful not to substitute 'our personal notions of proper police procedure for the instantaneous decision of the officer at the scene.'" *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992). Instead, this court must adopt a "built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case." *Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). "After all, 'what constitutes reasonable action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.'" *Mullins*, 805 F.3d at 766 (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1163 (6th Cir. 1996).

In this circuit, the court "consider[s] the officer's reasonableness under the circumstances he faced at the time he decided to use force." *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017) (citing *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (discussing the "segmented analysis" this circuit employs to analyze use-of-force claims). Accordingly, "[w]e do not scrutinize whether it was reasonable for the officer to create the circumstances." *Thomas*, 854 F.3d at 365 (internal quotation marks and citation omitted). "[A] different Fourth Amendment violation cannot transform a later, reasonable use of force into an unreasonable seizure." *Los Angeles v. Mendez*, 137 S. Ct. 1539, 1544 (2017).

Lastly, in the use-of-force context, "once the relevant set of facts is determined and all reasonable inferences are drawn in favor of the plaintiffs, to the extent supported by the record, the question of whether the [officers'] actions were objectively unreasonable is 'a pure question

of law.'" *Chappell v. City of Cleveland*, 585 F.3d 901, 909 (6th Cir. 2009) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007); citing *Dunn v. Matatall*, 549 F.3d 348, 353 (6th Cir. 2008)). But "*if* there is some evidence – more than a mere scintilla of evidence – that [the appellant], through his conduct, judged from the perspective of reasonable officers on the scene, did not give the officers probable cause to believe that he posed a serious threat of harm, a genuine fact dispute is created." *Chappell*, 585 F.3d at 909 (emphasis in original).

Analyzing the use of force from the perspective of a reasonable officer on the scene, we hold that the use of deadly force by the Officers in this instance was justified even though there are issues of fact concerning (1) whether Thornton saw or heard the Officers, (2) whether Thornton had time to comply with the Officer's orders, and (3) whether Thomson was actually facing or walking towards the Officers. This is so, because what is undisputed is that the Officers responded to a report of a man threatening others with a gun while standing on a front porch of a residence. Further, as the Officers exited their police cruiser, several individuals informed the officers that Thornton had run inside the residence while possessing a firearm. After moving to the porch, the Officers witnessed Thornton emerge from the back of the house with a shotgun, in addition to seeing an armchair in the living room with an assault rifle resting on it.

Moreover, there is no dispute that the Officers could have reasonably believed that the man with the shotgun was the same man who had, only moments earlier, threatened another person with a gun. Officers repeatedly ordered Thornton to drop the shotgun but Thornton failed to comply with the Officers' orders, and whether Thornton actually heard the commands has no bearing on this court's analysis. *See Murray-Ruhl v. Passinault*, 246 F. App'x 338, 350 (6th Cir. 2007) (recognizing that the "subjective intent of the victim – unavailable to the officers who

14

must make a split-second judgment – is irrelevant to the question [of] whether his actions gave rise to a reasonable perception of danger."). And though Thornton never pointed the shotgun at the Officers before they fired their weapons, the undisputed manner in which Thornton was holding the weapon combined with the short distance between himself and the Officers further leads this court to conclude that any reasonable police officer would believe that Thornton posed a serious physical threat that required a use of deadly force. Additionally, because the deadly threat posed by Thornton could have easily and quickly transformed into deadly action in a split-second, any reasonable police officer in the Officer's position would know that a decision to use deadly force would need to be rendered quickly.

The Officers also did not have to wait for Thornton to raise his weapon before employing deadly force. *See Anderson v. Russell*, 247 F.3d 125, 131 (4th Cir. 2001) ("[A]n officer does not have to wait until a gun is pointed at the officer before the officer is entitled to take action."). Relatedly, this court has recently rejected a "categorical rule that force can only be reasonable if a suspect raises his gun." *Thomas*, 854 F.3d at 366. Accordingly, for the aforementioned reasons, the Officers did not violate Thornton's constitutional rights by utilizing force on him on April 21, 2013. Therefore, the district court properly granted summary judgment in favor of the Officers on Thornton's excessive force claim because the Officers were entitled to qualified immunity. We need not discuss the "clearly established" prong of qualified immunity analysis on this claim either, because Thornton has failed to establish the violation of a constitutional right. *See Martin*, 712 F.3d at 957.

### 3. Municipal Liability

All of Thornton's claims against the City are brought under § 1983 as well. "A [party] raising a municipality liability claim under § 1983 must demonstrate that the alleged federal

violation occurred because of a municipal policy or custom." *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Monell v. New York City Dept' of Soc. Servs.*, 436 U.S. 658, 694 (1978)). In order to prevail under *Monell*, an appellant must establish that "(1) their constitutional rights were violated and (2) 'the municipality's policy or custom led to the violation.'" *Garner v. Harrod*, 656 F. App'x 755, 760 (6th Cir. 2016) (quoting *Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014)). If an appellant can show that his or her constitutional rights were violated at step one of the analysis, an appellant can meet the requirements of step two by demonstrating one of the following: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess*, 735 F.3d at 478 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

Notably, "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue. *Respondeat superior* or vicarious liability will not attach under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

Here, we quickly dispose of Thornton's argument and affirm the district court's grant of summary judgment on this issue in light of our earlier finding that there were no constitutional violations, and "[n]o constitutional violation means no municipal liability." *Thomas*, 854 F.3d at 367 (citation omitted). Because no constitutional violations occurred, the district court properly granted summary judgment on Thornton's § 1983 claims against the City.

## CONCLUSION

In the case before us, Appellant Thornton was threatening numerous individuals with a gun. He withdrew to his bedroom and emerged with a shotgun, and was shot by police after

failing to respond to lawful commands ordering him to drop the firearm. The Officers were justified in using such force. For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment in favor of the Officers and the City of Columbus.